Filed 3/26/15  Fabbio v. Narghizian CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LUCIANO FABBIO, | B251817 |
| Plaintiff, Cross-Defendant and Respondent, | (Los Angeles County Super. Ct. No. BC287492) |
| v. | |
| ZAREH NARGHIZIAN et al., | |
| Defendants, Cross-Complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kevin C. Brazile, Judge.  Affirmed.


Deian V. Kazachki for Defendants, Cross-Complainants and Appellants.


Hillel Chodos and Diane L. Fellla for Plaintiff, Cross-Defendant and Respondent.


_____

Defendants, cross-complainants and appellants Zareh and Aida Narghizian[1] appeal from a revised final judgment entered following a prior appeal. We affirm the judgment.

## FACTS

In 1994, Narghizian and plaintiff, cross-defendant and respondent Luciano Fabbio entered an oral joint venture agreement to buy and resell cars. The venture's framework was that Fabbio would provide the money to buy the cars, Narghizian would do the actual buying and reselling, and profits would be divided 40 percent to Fabbio and 60 percent to Narghizian. The joint venture enterprise operated in connection with a business known as Modena Motorcars. In late 2001, the parties' joint venture relationship came to end.[2] (See *Fabbio v. Narghizian* (July 26, 2007, B184136) [nonpub. opn.]; see also *Fabbio v. Narghizian* (May 12, 2010, B209868 [nonpub. opn.].)

In 2002, Fabbio filed a complaint against Narghizian, who, in turn, filed a cross-complaint against Fabbio. Each accused the other of diverting money from the parties' joint venture. The action was tried to a jury, which returned a verdict with special interrogatory answers as follows: Narghizian committed fraud and conversion, causing $310,000 in damages to Fabbio; at all relevant times Modena Motors was solely owned by Fabbio; and Narghizian purchased real property (the "Mt. Olympus property") with money "belonging to Fabbio" and obtained by Narghizian through fraud. The jury further decided that Fabbio was entitled to punitive damages. In a bifurcated proceeding, the jury fixed the amount of punitive damages in the sum of $290,000. The trial court denied Narghizian's request for an accounting on the ground that the cost and effort of an accounting would outweigh its benefit; the court imposed a constructive trust in favor of Fabbio as to the Mt. Olympus property. (*Fabbio v. Narghizian, supra,* B184136.)

---

[1]    We will refer to both Narghizians collectively as Narghizian; we refer to them individually only as needed for clarity.

[2]    The parties' versions of events were either that Fabbio "locked out" Narghizian after learning of his self-dealing, or Narghizian voluntarily "left" the business after he learned of Fabbio's self-dealing.

In April 2005, the trial court entered a judgment which incorporated the jury's findings and the other matters noted above. The judgment included further provisions to the effect that the evidence at trial "established without dispute" that of the $310,000 obtained by Narghizian from Fabbio, the sum of $250,000 (rounded) had been used as a down payment to purchase the Mt. Olympus property. Also, the balance of the $550,000 purchase price for the Mt. Olympus property had been financed through a "first trust deed carry back" by the seller, which Narghizian had later paid off for $270,000, obtaining a discount of $30,000. Further, Narghizian paid the $270,000 by using $200,000 obtained through the sale of another piece of real property and a loan from Washington Mutual secured by a new first deed against the Mt. Olympus property. The judgment included provisions that Fabbio was entitled to a constructive trust on the Mt. Olympus property, subject to Washington Mutual's first trust deed, and a credit in favor of Narghizian for the $200,000 used to pay off the seller. Narghizian was ordered to execute quitclaim deeds in favor of Fabbio, "together with such other instruments as may be necessary to vest title in him subject to the [Washington Mutual] encumbrance." Taking into account the credit and constructive trust, the judgment awarded $167,388.20 to Fabbio. Punitive damages in the amount of $290,000 were an additional money judgment against Narghizian. (See *Fabbio v. Narghizian, supra,* B184136.)

On a prior appeal, we affirmed the award of compensatory damages in favor of Fabbio, i.e., the jury's determination of Narghizian's liability on Fabbio's complaint, and the imposition of a constructive trust in favor of Fabbio as to the Mt. Olympus property. We reversed the order denying an accounting, and reversed the jury's award of punitive damages upon finding the award was excessive in light of the evidence of Narghizian's financial condition. We also reversed the trial court's order for a directed verdict in favor of Fabbio on Narghizian's cross-complaint. (*Fabbio v. Narghizian, supra,* B184136.)

In August 2008, following remand, the trial court entered an order appointing retired Court of Appeal Justice Robert Feinerman to act as an accounting referee in the case. Justice Feinerman retained the services of an accounting firm, RBZ, LLP, to prepare an accounting. In May 2011, RBZ submitted its accounting schedule to Justice

3

Feinerman.  Later in May 2011, Justice Feinerman filed a report and recommendation to the trial court.  For approximately six months following Justice Feinerman's report, the parties submitted extensive briefing in support of, and in challenge to, the overall conclusions of the accounting report, and the methodologies employed to reach its conclusions.  For example, Narghizian submitted a declaration from a certified public accountant, Allen Ullman, who offered the following observations and opinions:

"3.     Based on my review [of RBZ's accounting schedule, the report and recommendation accounting referee, and recently produced business records of Modena Motors], and based on my background, training and experience, as a certified public accountant, it is my opinion, to a reasonable degree of probability, that the schedule prepared by RBZ, LLP cannot be considered a true and accurate representation of the profits, expenses, and draws of both Narghizian and Fabbio during their business relationship from 1994 to 2001.

"4.     RBZ's analysis does not include any information pertaining to what . . . Fabbio's draws were during the joint venture.  Considering the very sloppy method of bookkeeping, Mr. Fabbio's draws are important to determine whether Mr. Narghizian was either overpaid or underpaid by the joint venture.  This is especially true in light of the fact that Mr. Fabbio testified that they labeled numerous checks paid to him as 'whatever fit the bill' . . . .  Accordingly, numerous checks labeled 'rent,' and 'loans,' including others, were in reality his 40% share of the profit participation.  RBZ, LLP did not know this, and did not perform the accounting according to this very important piece of information.

"5.     Upon review of the Modena records, I concluded that numerous car jackets were missing, and other car jackets were not complete.  The absence of these key records makes RBZ, LLP's findings regarding the proceeds from sales of vehicles, purchase price of vehicles,

4

and gross profit conclusions questionable. Presently, there are too many missing records in order for an accurate accounting to be completed.

"6. Modena's tax records must be obtained and considered to be able to cross reference those documents with records that were available.

"7. Modena's Lotus 1-2-3 program is a key business record that must be utilized to fill in numerous gaps present in the business records. RBZ, LLP did not refer to this key business record.

"8. RBZ, LLP was retained to perform a forensic accounting. However, after reviewing both their report, and the aforementioned records, it is my opinion that a forensic accounting did not actually take place. Instead, RBZ engaged in a standard book keeping exercise."

On March 27, 2012, the trial court entered an order approving the reports and recommendations of the accounting referee, together with RBZ's underlying accounting schedules. Of importance to the issues on the current appeal, the court made minor changes to RBZ's accounting schedules as follow: modifying the figures for total sales proceeds from $58,096,432 to $58,177,585; and the figures for gross profits from $3,255,065 to $3,336,218; and the figures for net profits from operations from $803,576 to $869,729. Based on the amount of net profits, the court calculated Narghizian's profit participation to be "$521,837 instead of $482,146." The court approved a figure for the amount of money distributed to Narghizian in the amount of "$878,353 instead of $857,548" as stated in the accounting referee's report. In the end, the court approved a figure of $356,516 as the amount "over distributed" to Narghizian.

Following the order approving the accounting reports, another round of motions and briefing ensued in support of, and in challenge to, the accounting figures. Ultimately, the trial court entered a "final revised judgment" on August 6, 2013 in accord with the figures which the court had previously approved. The judgment includes the following provisions:

5

"The constructive trust imposed by the 2005 judgment and affirmed by the Court of Appeal was enforced; Fabbio acquired and then sold the Mt. Olympus property in 2008 and received payment from the proceeds of that sale for the $310,000 of compensatory damages awarded to him by the jury in 2005. Fabbio was later ordered to pay, and did pay through an interpleader action, $187,839 of the proceeds from the sale of the Mt. Olympus property to Zareh and Aida Narghizian to reimburse them for their contribution to the down payment for the purchase.

"Following the remand, an accounting was conducted of the net profits of the Modena Motors joint venture under the supervision of an Accounting Referee appointed by the Court. The Accounting Referee's Report and Recommendation were approved by the Court on March 27, 2012, finding that contrary to his claims of underpayment, Zareh Narghizian had caused himself to be overpaid by $356,516, paid to him and his wife, Aida Narghizian, and received by him in violation of his fiduciary duty to Fabbio as a joint venturer with Fabbio in Modena Motors, and was indebted to Fabbio for that amount. Subsequently the Court ordered that Zareh Narghizian would also be indebted to Fabbio for interest on the $356,516 overpayment from May 22, 2003, to the date of payment. Copies of the Orders approving the Report and Recommendation of the Accounting Referee, and requiring interest from May 22, 2003, are attached hereto as Exhibits C and D, and are incorporated by reference herein. It was further determined that by virtue of the results of the accounting, Narghizian's cross-claims against Fabbio for breach of contract and breach of fiduciary duty by Fabbio, based on Narghizian's alleged underpayment for his share of the net profits of Modena Motors, were moot.

"Pursuant to the 2007 Opinion of the Court of Appeal, a court trial was held on July 1 and July 2, 2013, to determine the amount of punitive damages for which Zareh Narghizian was liable for the fraud found by the jury in the 2005 trial. The court took the matter under submission. On July 8, 2013 the Court ruled that Narghizian would owe Fabbio $25,000 in punitive damages.

"The allocation of the costs of the accounting of the business records of Modena Motors will be determined upon motion.

6

"It is therefore hereby ORDERED, ADJUDGED AND DECREED as follows:

"1.  Plaintiff is entitled to a money judgment against defendant Zareh Narghizian in the amount of $356,516 for breach of fiduciary duty, constituting the amount overpaid to Zareh Narghizian, either in his own name or in the name of his wife, Aida Narghizian, based upon the final accounting of the business affairs of the Modena Motors joint venture (aka Modena Motorcars); and in addition, plaintiff is entitled to interest on the said amount of $356,516 at 10% per annum from May 22, 2003, the date on which the accountants determined was the last transaction relating to the business operation of Modena Motors, to the date of judgment herein.  Interest at the legal rate of 10% per annum for 10 years plus 63 days through July 23, 2013, amounts to $362,669.84.  Principal plus interest to July 23, 2013, totals $719,185.84, with a per diem rate of interest thereafter of $97.68.

"2.  Plaintiff Fabbio was ordered to and did advance all the costs of the accounting in the sum of $84,187.50, subject to re-allocation is accordance with the result, and is therefore further entitled to an additional money judgment against defendant Zareh Narghizian in the amount of $ (Per Motion) for the costs of the final accounting.

"3.  Plaintiff is further entitled to an additional money judgment against defendant Zareh Narghizian on account of the 2013 award of punitive damages in the sum of $25,000.

"[4].  Plaintiff is further entitled to recover costs of suit against Zareh and Aida Narghizian in the sum of $_____, to be determined by the filing of a memorandum of costs."

Zareh Narghizian and Aida Narghizian filed a timely notice of appeal.

### DISCUSSION

### I.    The Motion to Dismiss Appeal

Before filing his respondent's brief, Fabbio filed a motion to dismiss Narghizian's appeal.  We deferred ruling on the motion to dismiss, and now address its claims.  Fabbio argues we should dismiss Narghizian's appeal because he "failed to provide a complete or adequate record of the proceedings in the trial court [concerning] the accounting order

and judgment." Fabbio argues he "should not be required to respond to an appeal which omits most of the evidence and the law presented to the trial court in support of the judgment." We find Fabbio's arguments are better addressed in examining Narghizian's claims of error on appeal on their merits. Therefore, the motion to dismiss the appeal is denied.

## II.     The Validity of the Accounting "on its Face"

Narghizian contends the revised final judgment must be reversed because the accounting which underpins the judgment "is defective on its face for . . . three reasons." Specifically, Narghizian asserts:

- The accounting shows on its face that RBZ "did not take into the account the draws of . . . Narghizian and Fabbio . . . during their business relationship," as we explicitly ordered to be done in our 2007 opinion.

- The accounting shows on its face that it was "not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America."[3]

- The accounting shows on its face that it "exceeded the scope of the accounting period" that we explicitly fixed in our opinion in 2007.

Narghizian has not persuaded us to find that the accounting is "defective on its face." The section of Narghizian's opening brief on appeal challenging the validity of the accounting "on its face" contains nothing more than the bald identifications of the three elements of the accounting noted above. Narghizian offers no discussion and no citation to legal authority in support of his position that those three elements, individually and or standing together, demonstrate that the accounting is "defective on its face" and as such, cannot support the revised final judgment.

---

**3**     We hereafter use the acronym GAAP to refer to generally accepted accounting principles.

**III.    The Validity of the Accounting in Light of the Record**

In a series of inter-related arguments, Narghizian contends the accounting which was conducted after the prior appeal was "defective" and or "void," and, thus, does not and cannot support the revised final judgment.  We disagree.

**A.  The Alleged Violation of Our Prior Opinion**

Narghizian contends the accounting is "void because it did not take into account the draws of [the parties,] as ordered by this appellate court."  We construe Narghizian's argument to mean: (1) as a matter of law, we prescribed explicit orders, in our 2007 opinion intended to govern the manner in which the post-remand accounting had to be prepared; (2) as a matter of fact, the accounting was not prepared in accord with the accounting rules that we prescribed in our 2007 opinion; and (3) the failure to prepare the accounting in accord with our prescribed accounting rules requires the reversal of the revised final judgment.  This argument does not persuade us to reverse the judgment.

**1.  Our 2007 Opinion**

The following is the language we used in our 2007 opinion in connection with the issue of an accounting after remand:

> " . . .  [W]hether [Narghizian]'s relationship with Fabbio was that of a joint
> venturer or only someone with a right to a share of the net profits, which
> both men agree was part of their arrangement, [Narghizian] had a right to
> an accounting.  [Citations.]

> "[Narghizian]'s burden in proving damages for breach of a joint venture

agreements or breach of fiduciary duty would require proof of the profits, expenses, and draws by both men during their business relationship from 1994 to 2001.  Given their sloppy method of writing checks not based on the sale of each car and unclear allocation of costs of the business, making that determination would understandably be difficult.  As noted above, [Narghizian] was entitled to an accounting and sought one both in his cross-complaint and by motions before the trial court.  Upon reversal and presumably an accounting, [Narghizian] will be in a better position to prove the allegations in his cross-

complaint. Therefore, the directed verdict must be reversed." (*Fabbio v. Narghizian, supra,* B184136.)

### 2. Analysis

"When an appellate court's reversal is accompanied by directions requiring specific proceedings on remand, those directions are binding on the trial court and *must* be followed. Any material variance from the directions is unauthorized and void." (*Butler v. Superior Court* (2002) 104 Cal.App.4th 979, 982, italics in original, citing *Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655-656, and similar cases.) In our 2007 opinion, we directed the trial court to order an accounting. This trial court did so.

Narghizian argues that we prescribed explicit rules governing the accounting. He has not persuaded us that we did. Even a liberal construction of our discussion about an accounting in our 2007 opinion does not support a conclusion that we intended to prescribe any particular accounting rules to be employed by the accountant. Rather, we explained in general terms the reasons that an accounting had to be prepared in the case. Within that general discussion, we noted the types of financial information which could be relevant for examination in preparing the accounting. The trial court did not violate our orders.

The overwhelming majority of the remainder of Narghizian's argument is not supported by references to the record. This said, he seems to argue that certain inputted money figures used in preparing the accounting were incorrect, or that calculations based upon such inputted incorrect figures, were themselves incorrect as a consequence. In Narghizian's own words: "The purported 'accounting' simply does not COMPUTE. Math is an exact science and therefore does allow for any wiggle room." (Emphasis in the original.)

Narghizian's argument does not persuade us to reverse. If any conclusion can be taken from the record concretely, it is this: the business records maintained in connection with the parties' joint venture was "sloppy" at best. Apart from this, the record submitted on appeal is sufficient, in our view, to support a conclusion that that accounting is about the best that can be expected insofar as showing the income, expenses and profits of the

10

enterprise. The record supports the conclusion that RBZ, with input from the parties and Justice Feinerman, determined that a reasonable accounting methodology was to look at the gross sales of all vehicles and then subtract direct costs of purchasing the vehicles to come up a gross profits figure from sales, and then to subtract the expenses of operating the business (Modena) to come up with a net profit figure. Once this net profit figure was determined, it was simply a matter of calculating the parties' contemplated 60/40 split.

In the end, we are not convinced there was violation of explicit accounting rules prescribed in our 2007 opinion.

### B. Generally Approved Accounting Procedures ("GAAP")

Narghizian contends the accounting does not and cannot support the revised final judgment because the accounting "was not performed in accordance with [GAAP]." We understand Narghizian to argue either (1) that RBZ's accounting lacked a foundational element required for it to be considered by the trial court in rendering judgment, or (2) that RBZ's accounting must be deemed insufficient to constitute substantial evidence in support of the revised final judgment. We disagree.

### 1. The Statements Associated with the Accounting

A cover letter from RBZ, attached to the accounting that it submitted to Judge Feinerman, the accounting referee, reads as follows:

> "We have compiled the special-purpose schedule of direct profit from operations (the Special-Purpose Schedule) of Modena Motors for the period from December 13, 1993 through May 22, 2003 in accordance with procedures approved by Justice Robert Feinerman, the Accounting Referee appointed by order of the Los Angeles Superior Court in the case of Fabbio vs. Narghizian. *We have not audited or reviewed, under generally accepted accounting standards, any amounts included in the accompanying Special-Purpose Schedule or the accompanying supplemental schedule.*

11

"Justice Feinerman is responsible for determining whether the Special-Purpose Schedule satisfies the requirements of the Los Angeles Superior Court. *Our responsibility is to conduct the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants in order to present financial information in the form of a Special-Purpose Schedule without undertaking to obtain or provide any assurance that there are not material modifications that should be made to the Special-Purpose Schedule if an audit or review were conducted.*

"*As discussed in Note B, the accompanying schedule has been prepared on a basis which is intended to most closely resemble the case basis and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America or the true cash basis of accounting.*

"This report is intended solely for the information and use of Justice Feinerman as it relates to his role as Accounting Referee in the case of Fabbio vs. Narghizian . . . ." (Italics added.)

### 2. Analysis

The only authority cited by Narghizian in support to his argument that adherence to GAAP is a required foundational element for an accounting to be considered by a trial court is *De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482 (*De Guere*). In *De Guere*, Division Four of our court examined Code of Civil Procedure section 639, the statute which authorizes the appointment of a referee for an accounting.[4] In

---

[4]     Code of Civil Procedure section 639 provides:  "(a) When the parties do not consent, the court may, upon written motion of any party, or of its own motion, appoint a referee in the following cases . . . :  [¶]  (1)  When the trial of an issue of fact requires the examination of a long account on either side; in which case the referees may be directed to hear and decide the whole issue, or report upon any specific question of fact involved

12

particular, Division Four addressed the issue of whether the statute violates our state constitution's prohibition against delegation of judicial power. (See Cal. Const., art. VI, § 22.) In examining this issue, Division Four provided an excellent review of the manner in which the statute for an accounting referee is ordinarily employed. The following is Division Four's discussion.

"The reference is allowed because a trained accountant is generally better able to efficiently and inexpensively examine a 'long account' than a trial court judge is able to do through adversarial court proceedings. The tension in this area is over how much latitude the accountant referee may exercise in making factual determinations. . . . The scope of the reference is set by the constitutional limitations on delegation of judicial power to a referee.

"To do a proper examination of a long account, a referee needs to know two things — each of which is within the proper ambit of his or her authority. First, the referee must know the proper accounting methodology to be applied. Second, the referee must have the accounting records at issue. The parties must obtain the necessary records through discovery to enable the referee to perform the examination.

"As to the first, we expect that in the ordinary case the referee will look to established and accepted standards of accounting principles, such as those prepared by the American Institute of Certified Public Accountants. But in particular industries, other standards may apply. In such cases, the referee must look to industry custom and practice." (*De Guere, supra*, 56 Cal.App.4th at p. 499, fn. omitted.)

Following the discussion quoted immediately above, the Court of Appeal in *De Guere* then explained that an accountant is constitutionally precluded from making legal rulings, such as whether an agreement is a contract of adhesion, or interpreting the terms

---

therein. [¶] (2) When the taking of an account is necessary for the information of the court before judgment, or for carrying a judgment or order into effect."

13

of the contract.[5] (*Ibid*.) We need not be concerned with such matters here, because the only issue addressed by RBZ's accounting was purely monetary matters; the interpretation of the parties' joint venture agreement is not an issue.

We do not read *De Guere* to establish a rule governing when a trial court may or may not consider an accounting based on the fact of whether or not there was adherence to GAAP. Accordingly, to the extent Narghizian may be claiming an evidentiary error in the trial court's giving any consideration at all to RBZ's accounting, we reject the claim of error for want of supporting legal authority.

In our view, it is better to examine Narghizian's argument as a claim involving the strength or weakness of the evidence through the accounting's conclusions. That is, a claim that the accounting is insufficient to constitute substantial evidence in support of the revised final judgment. So viewed, we are not of the opinion that the accounting is deficient. The shortcomings argued by Narghizian on appeal were well-presented to the trial court, and we presume the court considered those elements in rendering its orders approving the account. In the end, we are satisfied that the question of whether or not an accounting presented to a trial court was prepared in accord with GAAP is a matter going to the weight of the accounting. Here, the trial court undertook a factual evaluation of the accounting, and approved a set of values for the money that moved back-and-forth in the joint venture enterprise. The accounting is substantial evidence in support of the trial court's ultimate financial findings. While it would have been stronger evidence had an accounting with actual auditing of the underlying figures, in accord with GAAP, we still find there was substantial evidence to support the judgment.

---

[5]     "Broadly speaking, there are three ways to deal with that problem. The trier of fact may resolve the factual and legal issues before making the reference; the referee may petition for instructions when such issues of contract interpretation and enforceability arise; or the referee may make findings based on each of the limited possible interpretations of the contract advanced by the parties, leaving it for the trier of fact to determine which interpretation should be adopted." (*De Guere, supra*, 56 Cal.App.4th at p. 499.)

## C. Scope of the Accounting Period

Narghizian contends the accounting does not and cannot support the revised final judgment because the accounting included financial schedules that "exceeded the scope" of our 2007 opinion. Narghizian's argument is that any financials after 2001, when he ended his relationship with Fabbio and Modena Motors, should not have been included in the accounting. We are not persuaded.

The record supports the conclusion that, when the parties' joint venture business relationship terminated, Narghizian left Fabbio with an inventory of six unsold cars for which Fabbio had already fronted the purchase money. Further, Narghizian had taken possession of another company vehicle which he allowed his son to drive; that vehicle was later abandoned in 2003. Insofar as the accounting addressed finances, including reasonable expenses and proceeds after 2001, to bring to an end matters put into motion by the end of the joint venture, we are satisfied that the accounting is not erroneous. Again, we see the bulk of Narghizian's arguments here to be a request for this court to reweigh the evidence, and to make findings in his favor. This is not the role of an appellate court.

## D. Conflicting Expert Accountant Evidence

Narghzian argues the accounting report "cannot be considered a true and accurate representation" of the profits, expenses, and draws of both Narghizian and Fabbio during their business relationship. He points us to the evidence that he presented from his own accountant in support of his challenges to the accounting, specifically, the declaration of Allen Ullman, CPA.

Narghizian's argument here harkens back to his previous contention that RBZ's accounting cannot be accepted as substantial evidence because it was not prepared in accord with GAAP. For the reasons explained above, we disagree with Narghizian's proposition that GAAP is a required element for an accounting to amount to substantial evidence.

15

## IV. The Approval Process

Narghizian contends the revised final judgment must be reversed because the trial court erred in the process of approving the accounting. Here, we understand Narghizian to argue that the accounting should not have been approved because he was "excluded from," or "shut out of," the accounting process. Further, Narghizian argues that the trial court did not "independently consider" the accounting in rendering judgment. In short, Narghizian contends the trial court simply "adopted the [accounting] in toto," rather than considering the accounting as an "advisory, not determinative" report on the evidence as it should have done. We find no error.

We presume the trial court performed its job of evaluating the accounting. (Evid. Code, § 663.) The record is consistent with this presumption. After RBZ submitted its accounting, through the accounting referee, the parties engaged in extensive briefing on the accounting's validity. The trial court decided that the accounting was sufficient to make a determination about the finances of the parties.

On the issue of participation in the accounting process, we find the record does not support Narghizian's claim that he was excluded from that process. As we have noted, the record shows that Narghizian was given the opportunity to submit voluminous materials in challenge to the accounting. That the trial court rejected Narghizian's challenges does not show that he was "shut out of" the process leading up to the adoption of the accounting report.

## V. Math

Narghizian contends that "math is an exact science." He instructs us: "4 + 4 = 8, not 12, not 16." Such argument is not helpful in assessing the correctness of the revised final judgment.

Building on his "math is a science" foundation, Narghizian offers this summation of the accounting: RBZ reported that the parties' joint venture generated a net profit of $869,729, of which Narghizian was entitled to $531,837 (60 percent) and Fabbio was entitled to $347,892 (40 percent). Finally, RBZ reported that $878,353 was distributed to

16

Narghizian. Next, Narghizian observes that the accounting referee approved these figures, and that the trial court, in approving the according referee's report, did the same.

Narghizian then offers this impassioned argument: " . . . WAIT A MINUTE, so RBZ is saying that the amount distributed to Narghizian EXCEEDS the Net Profit from Operations. In other words, RBZ is saying that Narghizian not only was paid all of the joint venture's net profits for its entire 'ten' (actually seven) year existence, but he also took some of the operating capital. What does that leave Fabbio? ZERO!!! A negative number? Is the acclaimed accounting firm RBZ saying that Fabbio, the 'money' man, funded a joint venture for ten years, invested a total of FIFTY-FOUR MILLION dollars in the purchase of cars and . . . took NOTHING!? This is insane! What sound business person would be willing to do this? What accounting referee would miss this? What accounting referee would approve this? What court would miss this? What court would approve this?"

*Analysis*

We agree with Narghizian that Fabbio — by any objective standard — could be deemed a poor businessperson if he invested $54 million in "new money" in a business over a period of 7 to 10 years, while receiving no return on investment in that same time frame.[6] It does not follow, however, that this means there has to be a math error in RBZ's accounting. Whether or not the underlying values used in RBZ's calculations were accurate is a different matter, and is discussed above in the context of Narghizian's GAAP contentions. But, here, with respect to "math being a science," Narghizian has not shown us that the math in RBZ's accounting is infected with error insofar as the adding, subtracting and multiplying of percentages, i.e., the raw numbers, are concerned.

---

[6] Of course, Fabbio did not invest $54 million in "new money" in the joint venture. He invested money to purchase a vehicle, and, when that vehicle was sold, the money was re-invested, and-so-on-and-so-on. It's not clear to us from Narghizian's arguments on appeal exactly how much new money was invested by Fabbio.

17

## VI. State of Mind

Narghizian contends the revised final judgment must be reversed because RBZ's underlying accounting "made no finding of a culpable state of mind" on his part. In this vein, Narghizian argues that the accounting made a finding that he was overpaid, but did not find that the overpayment constituted a breach of fiduciary duty. Again, we are not persuaded.

First, as discussed by the court in *De Guere, supra*, 56 Cal.App.4th 482, a person who conducts an accounting pursuant to the statutorily-approved, court-ordered reference process does not have the authority to make legal or factual findings. To do so would potentially create a problem of the accountant usurping the judicial function. Second, the revised final judgment in the current case includes provisions declaring that Narghizian's breach of fiduciary duty claims are "moot" because the accounting showed that Fabbio did not take more than his allotted percentage share out of the parties' joint venture enterprise. Stated in another words, the trial court made the "state of mind" determination that Narghizian decries is lacking. The simple matter is that Narghizian was not entitled to receive more than his share of the joint enterprise's net profits, yet he did receive more. Further, the fact that he was held liable for punitive damages is a reflection of the jury's finding that he had acted with fraud in connection with taking $310,000 from Fabbio.

## VII. Proper Parties

Narghizian contends "the parties to the remand judgment were not properly before the [trial] court." It appears Narghizian's argument is predicated on a bankruptcy petition that he says he filed before the "trial" which took place after the case was remanded following our opinion on the original appeal in 2007. We summarily deny Narghizian's arguments because they are not supported by references to the record, and otherwise do not explain why the parties were not properly before the trial court. Apart from this, the record shows active participation by all parties after our remand. Narghizian has failed to demonstrate the trial which took place after our remand should never have occurred or

18

that it was otherwise infected with error, as a result of any bankruptcy or based upon bankruptcy law.

## VIII.  Aida Narghizian

Aida Narghizian contends "there should not be any new judgment for costs against [her]."  We disagree.

Aida Narghizian was a named defendant and cross-complainant.  She benefitted from the Modena business to the extent she and her husband were able to receive money from Modena for their personal uses.  During the years of the litigation, Aida Narghizian has not sought to be dismissed, nor has she dismissed the claims she asserted, nor has the trial court dismissed her as a party.  As a party to the action, the judgment properly holds her accountable for allowable costs.

## DISPOSITION

The revised final judgment entered August 6, 2013 is affirmed.  Respondent to recover his costs on appeal.


BIGELOW, P.J.

We concur:


FLIER, J.


GRIMES, J.

19